WILLIAM C. HAM *vs.* MAINE CENTRAL RAILROAD COMPANY.

Somerset.　　Opinion March 10, 1922.

*At grade crossings travelers and railroad companies have concurrent rights and mutual*
*obligations.　It is negligence per se for a driver of a conveyance to attempt to*
*cross a railroad track without first looking and listening if there is*
*an opportunity to do so.　Negligence of a driver of a con-*
*veyance cannot be imputed to a passenger in the con-*
*veyance.　Verdict for plaintiff not*
*disturbed.*

In an action of tort the plaintiff, a passenger in an automobile, recovered a verdict for injuries received in a collision at a highway crossing. Upon motion and exception by defendant it is,

*Held:*

1.　It is settled law in this State that at grade crossings the traveler and the railroad company have concurrent rights and mutual obligations. Neither has an exclusive right but inasmuch as a railroad train runs on a fixed track and readily acquires a peculiar momentum it cannot be expected that when once in motion it will stop and give precedence to a team approaching on the highway. It cannot be required to do so except in cases of manifest danger where it is apparent that a collision could not otherwise be avoided.

2.　If a railroad company negligently permits trees and bushes to grow within its location to such an extent that a traveler's view of approaching trains is so obstructed that they cannot be seen until the traveler is close to the track, it becomes the duty of the company to use extra precaution to avoid collision, as by a less amount of speed or by increased warnings; or if an unslackened speed is desirable, by keeping a watchman on duty or some other sufficient means of warning travelers.

3.　Grouping all the facts in this case together on the question of the defendant's negligence, the obstructing trees; the possible failure to give warning, the unguarded crossing and the rate of speed, it is not clear that the conclusion of the jury was manifestly wrong.

4.　On the question of the plaintiff's contributory negligence it is a positive rule of law in this State that it is negligence per se for the driver of a conveyance to attempt to cross a railroad track without first looking and listening if there is an opportunity to do so. If obstacles prevent his looking, the traveler should stop if there is room for doubt.

5.　The plaintiff in this case was not the driver but a passenger, and even if the driver could be charged with a lack of due care, negligence on his part cannot be imputed to the plaintiff.

6. The plaintiff is responsible for his own conduct and is held to that degree of care which a reasonably prudent man would exercise under the same circumstances and conditions.

7. Measured by this test the finding of the jury that the plaintiff was in the exercise of due care should not be disturbed.

On motion and exception. This is an action on the case to recover for personal injuries sustained by the plaintiff resulting from a collision of an automobile in which plaintiff was a passenger, with a train of defendant company at the Western Avenue crossing, so called, in the town of Fairfield, on July 18, 1920. The cause was tried to a jury at the April Term, 1921, of the Supreme Judicial Court for the County of Somerset, and a verdict of $2,750 was returned for the plaintiff. The defendant filed a general motion for a new trial, and also took an exception to the refusal of the presiding Justice to direct a verdict for the defendant. Motion and exception overruled.

The case is fully stated in the opinion.

*Andrews, Nelson & Gardiner,* for plaintiff.

*Carroll N. Perkins, and Thomas N. Weeks,* for defendant.

SITTING: CORNISH, C. J., SPEAR, HANSON, DUNN, MORRILL, JJ.

CORNISH, C. J. The plaintiff was injured in a grade crossing collision at Western Avenue in the Village of Fairfield on Sunday, July 18, 1920. He recovered a verdict of $2,750. The case is before the Law Court on defendant's exception to the refusal of the presiding Justice to direct a verdict in its favor, and also upon a general motion to set aside the verdict rendered by the jury. The exception and motion therefore raise a single question, and that is the duty of the court to set aside the verdict under the evidence.

The locus may be briefly described as follows: Western Avenue runs east and west and crosses at grade the tracks of the defendant running north and south, on the Skowhegan branch, at about 1,400 feet northerly of the Fairfield station. The train, known as the paper train, left the station on its way to Skowhegan at 10:31 A. M., two minutes late. It was composed of a locomotive and four cars. It crossed Elm Street at a distance of 800 feet from the station and the next crossing was at Western Avenue, 600 feet further on. The speed of the train at Western Avenue is stated by the engineer as

fifteen miles per hour.  The plaintiff, a man thirty-nine years of age and a resident of Fairfield, was a passenger in the automobile of his brother-in-law, Mr. Jones, a resident of Brooks, and was sitting on the front seat at the left of Mr. Jones who was driving.  On the rear seat were Mrs. Jones, their two daughters and a young man named Works.  The car had a top but the curtains were then off.  On the forenoon in question the party left the plaintiff's house on Maple Street, northwest of the crossing, drove southerly to Western Avenue and then easterly to the Western Avenue crossing on their way to Main Street.  The grade of the highway was slightly descending. The speed of the auto was given at not over eight miles at any time after they left the house and that decreased to four or five miles an hour as they approached the crossing.  Newhall Street leads off to the south between Maple Street and the crossing and a house in the corner of Newhall Street and Western Avenue extends easterly to a point about forty or fifty feet from the railroad, shutting off the view to the south.  Newhall Street is thickly populated, so that it is not claimed that any view of an approaching train could be had until after the corner house has been passed on the right.  At a point about one hundred feet southerly of the crossing cherry trees and bushes had been allowed to grow within the railroad location and extended, as the photographs taken immediately after the accident show, from the westerly side of the location to a point sixteen feet from the westerly rail, and they were of such size, height and spread that when in full foliage as at that time the view of the railroad or of a train beyond this one hundred feet was practically shut off to the traveler approaching the crossing from the west.  Had the trees and bushes been removed, as they afterwards were, a clear view for 375 feet from a point twenty or twenty-five feet from the crossing could have been obtained.  So much for a brief description of the locus.

The accident was a serious one.  The automobile was picked up by the engine and carried on the pilot a distance of about three hundred feet, in such a position that it could not be seen either by the engineer or the fireman.  The plaintiff was thrown out toward the east at a point about sixty or seventy-five feet beyond the crossing.  Mr. Works was killed.  The engineer did not see the auto and knew nothing of the accident until he felt an impact which he thought at first was caused by a crossing plank.

1. NEGLIGENCE OF THE DEFENDANT.

It is settled law that at grade crossings the traveler and the railroad company have concurrent rights and mutual obligations. Neither has an exclusive right, "But inasmuch as a railroad train runs on a fixed track and readily acquires a peculiar momentum it cannot be expected that when once in motion it will stop and give precedence to a team approaching on the highway. It cannot be required to do so, except in cases of manifest danger where it is apparent that a collision could not be otherwise avoided. It is the duty of the traveler on the highway to wait for the train. The train has the preference and the right of way." *Smith* v. *Maine Cen. R. R. Co.*, 87 Maine, 337, 347; *Lesan* v. *Maine Cen. R. R. Co.*, 77. Maine, 85.

This rule imposes upon both parties the duty of exercising reasonable prudence in view of all the circumstances of the case. It is the common law rule applied to a somewhat modern situation, and it is both reasonable and salutary.

The plaintiff's first charge of dereliction of duty on the part of the defendant is in negligently permitting the trees and bushes to grow upon and within its location to such an extent as to obscure all vision of a train more than one hundred feet south of the crossing. This raises a question of novel impression in this State. The situation has heretofore been treated from another angle. The duty of a traveler in approaching a grade crossing when his view has been cut off by trees or structures or embankments has frequently been passed upon and the wise rule has been adopted that the more obstructed the view the greater the precaution incumbent on the traveler; the blinder the crossing, the more careful the one who attempts to cross. That rule still obtains in all its strictness.

But in the case at bar we are now considering not the plaintiff's contributory negligence, but the effect upon the defendant's care in the operation of its train when it has needlessly, and the plaintiff says negligently, allowed trees and bushes materially obstructing the traveler's vision to grow upon its own premises. That is another and different proposition. Some authorities have gone so far as to hold that such permission, such an act of omission in failing to remove the obstructions to the view from a public street crossing is negligence as a matter of law, and actionable per se. *Indianapolis &c. Ry. Co.* v. *Smith*, 78 Ill., 112; *Chicago &c. R. R. Co.*, 26 Ill. App., 362; *Terre Haute &c. R. R. Co.* v. *Barr*, 31 Ill., App. 57.

We think, however, the better rule is that the mere neglect to remove such trees and bushes is not actionable negligence per se, but the existence of such obstructions on its right of way is properly to be considered by the jury as one of the circumstances in determining the degree of vigilance which the company is bound to exercise in the running and management of its trains and in giving warning of their approach. When the company itself obstructs the vision and takes away the chance to see and perhaps diminishes the opportunity to hear on the part of the traveler should not the jury be permitted to decide whether the company must take additional precautions to inform him of the approach of the train by other means, or to reduce the speed? What seems to us to be the reasonable and logical rule is stated as follows:

"If a railroad company, in the management of its business, causes unusual peril to travelers, it must meet such peril with unusual precautions and failing in this is guilty of negligence. This rule is particularly applicable where the traveler's view of approaching trains at a crossing is so obstructed that they cannot be seen until close to the track. In such a case it becomes the duty of the railroad company to use extra caution to avoid collision as by a less amount of speed, or by increased warnings or otherwise; or if an unslackened speed is desirable, by keeping a watchman on duty or some other sufficient means of warning travelers." 22 R. C. L. 990; see also *Cowles* v. *N. Y., N. H. & H. R. R. Co.*, 80 Conn., 48, and notes 12 L. R. A., N. S., 1067, 10 A. & E. Ann. Cas., 481; *Danskin* v. *Penn. R. R. Co.*, 76 N. J., 660 and notes, 22 L. R. A., N. S. 232 and cases cited. This rule is fair to the traveler and imposes no injustice upon the railroad company, because it is always within the power of the railroad company to remove the source of danger which its own inattention has created.

In view of this accepted principle were the jury justified in holding that the defendant in the present case was not meeting its full measure of duty? There is no pretense of any extra precautions being taken because of the obstruction on the right of way, and the plaintiff contended that even the ordinary signals were lacking, that neither was whistle sounded nor bell rung on approaching Western Avenue. So far as the whistle was concerned, the statute did not then require it, but it is in evidence that at one time a whistling post stood at some point between the station and this crossing and that it had been removed prior to the accident, just when does not appear.

On the question of ringing the bell, the evidence is sharply conflicting. The locomotive was equipped with an automatic bell controlled by compressed air. The engineer testified that he started the bell just as he was leaving the station and that it rang unceasingly until after the accident. The fireman corroborates him. The conductor says it was ringing when they left the station and after the accident, but he cannot testify to the intervening time as he was taking tickets. Five other witnesses, not employees but located at different places, testify to hearing the bell.

On the other hand, the plaintiff and Mr. and Mrs. Jones who were watching, and whose minds were at the time intent upon the subject, testify positively that the bell did not ring, and they are corroborated by three disinterested witnesses located at different places who make the same statement that the bell did not ring, and in some measure by six others who testified that they heard no bell although they were in a position to have heard it had it rung. It is true that the starting of the bell on leaving a station becomes almost a second nature with an experienced engineer, and it is also true that on such a controverted fact as this, positive testimony has far greater probative force than negative.

Still in this state of the testimony we think it was a disputed fact for the jury to decide, and we do not feel that if in reaching their verdict they concluded that the statutory signal was not given, their finding was so manifestly wrong as to require reversal by this court. *Daniels* v. *N. Y., N. H. & H. R. R. Co.*, 183 Mass., 393-396; *McDonald* v. *N. Y. Cen. R. R.*, 186 Mass., 474; *Borders* v. *B. & M. R. R.*, 115 Maine, 207, 210.

In this connection may be considered the absence of a flagman or automatic signal at the crossing itself. Neither had been ordered by the Public Utilities Commission under Public Laws 1917, Chapter 50, 1919, Chapter 116, yet this too was properly a fact for the consideration of the jury. Not all such crossings require a flagman or an automatic signal, and yet because of the obstructed view, the necessity of the one or the other as matter of ordinary prudence was within the consideration of the jury. The engineer is reported to have said at the time that this was the blindest crossing on the road.

The remaining point is the speed at which the train was moving. This is not strenuously urged by the plaintiff. The engineer states that it was at the rate of fifteen miles per hour. Prior to 1917 the

statute prohibited the running of trains across a highway near the compact part of a town at a greater rate than six miles per hour. R. S., 1916, Chap. 57, Sec. 79.    This was repealed by Public Laws, 1917, Chapter 174, and the matter was left with the Public Utilities Commission to fix a maximum speed limit at any grade crossing. None had been fixed at Western Avenue, but the duty still devolved upon the defendant to run its trains over this crossing at a reasonable rate in view of the other determining elements in the problem.

Grouping all the facts on the question of defendant's negligence, the obstructing trees, the possible failure to give warning, the unguarded crossing and the rate of speed, we do not feel justified in saying that the conclusion of the jury was clearly unsupportable.

### 2.    CONTRIBUTORY NEGLIGENCE OF THE PLAINTIFF.

Another positive rule in connection with grade crossing accidents was announced long since in this State and has been consistently and insistently followed, viz.:    that it is negligence per se for the driver of a conveyance to attempt to cross a railroad track without first looking and listening if there is an opportunity to do so.    If obstacles prevent his looking, the traveler should stop if there is room for doubt.    *State* v. *Maine Central R. R. Co.*, 76 Maine, 357; *Borders* v. *B. & M. R. R.*, 115 Maine, 207, 211.    This rule, so firmly established, we do not relax in the slightest degree.    It is sound in theory and salutary in practice.

At the outset it must be remembered that the plaintiff was not the driver of the automobile but a passenger, and even if the driver could be charged with a lack of due care, a point which it is unnecessary to decide in this case, negligence on his part could not be imputed to the plaintiff under the established doctrine in Maine.    *State* v. *B. & M. R. R.*, 80 Maine, 430.

If not responsible for the conduct of the driver the passenger is, however, responsible for his own conduct and is held to that degree of care which a reasonably prudent man would exercise under the same circumstances and conditions.    We think the plaintiff fully met this test.    What took place at the critical moment is described by him as follows:

"Q.    Will you state what happened after you turned into Western Avenue?

A.  Why, as the car drove down to the crossing I was listening and had been listening. There was no noise going on and I was listening for any new noise there was.

Q.  How near did you drive to the crossing?

A.  Twenty or twenty-five feet and the car slowed up.

Q.  Did it stop?

A.  No, sir.

Q.  How slow were you going?

A.  Oh, I should say four or five miles an hour when the car slowed up.

Q.  And did you look and listen?

A.  Yes, sir.

Q.  Did Mr. Jones look and listen?

A.  Mr. Jones and I started to look down the track and was looking at that time.

Q.  That is in looking down the track do you mean looking down by these bushes?

A.  Yes, looking towards the station.

Q.  And as you stopped there and looked down the track was there any train in sight?

A.  No, sir.

Q.  Was your automobile making a noise so that you couldn't hear?

A.  No, sir.

Q.  Was it quiet?

A.  It was quiet.

Q.  And was there anything in the automobile to prevent your hearing the approaching train?

A.  No, sir.


      .   .   .   .   .   .   .


Q.  What was the condition of the bushes on the track there?

A.  They obstructed our view.

Q.  And what were these bushes?

A.  They were cherry, cherry bushes and cherry trees.

Q.  As you stopped there some twenty feet from the track or as you slowed down there and listened could you hear any train coming?

A.  No, sir.

Q.  Was there any bell ringing?

A. No, sir.

Q. Was any whistle blowing?

A. No, sir.

Q. Was there anything to apprise you of the approach of the train?

A. No, sir, not anything.

Q. Did this man sitting on the right of you interfere in any way with your view?

A. Yes.

Q. What did you do in order to guard yourself?

A. I started to look down the track, and I noticed he was leaning forward and I straightened back and looked over his back.

Q. Which way was he looking?

A. He was looking down the track at the same time.

.   .   .   .   .   .   .   .

Q. And then after you had looked to the right side sitting as you did on the left of Mr. Jones, what did you do next?

A. I looked back up the track.

Q. And as you looked back up the track was the car started?

A. Yes, sir.

Q. Then what happened?

A. As I was looking up the track and listening for any sound or anything I felt this dreadful jump, or something jump quick, a quick motion and I turned around to look quick and there was the engine.

Q. Where was the engine?

A. Right by the sidewalk crossing.

Q. Was it making a noise?

A. I didn't hear any noise then.

Q. Was any bell ringing?

A. No, sir.

Q. Did you hear that train until you turned and saw it almost on the sidewalk crossing?

A. I never heard the train at all."

In this testimony as to his own conduct the plaintiff is contradicted by no one and is corroborated both by Mr. Jones the driver and by Mrs. Jones who called her husband's attention to the crossing as they approached it. The distance given by the plaintiff as a point twenty

or twenty-five feet from the crossing at which they went the slowest and looked in either direction is of course only a rough estimate because under such conditions men are not judging distances. In fact mathematical calculations based upon mere estimates either of time or distance are apt to be misleading as a slight variation in the postulate creates a vast change in the mathematical result.

We have quoted the plaintiff's testimony at unusual length in order to sharply differentiate this case from that long line of decisions where plaintiffs have properly failed of recovery because of their inattention and thoughtlessness in driving upon a crossing without looking and listening or attempting to ascertain whether a train was approaching, or, having seen the train, recklessly attempted to cross in front of it, of which *Chase* v. *Maine Central R. R. Co.*, 78 Maine, 346, *Smith* v. *Same*, 87 Maine, 339, *Day* v. *B. & M. R. R.*, 96 Maine, 207, and *Crosby* v. *Maine Central R. R. Co.*, 113 Maine, 270, are illustrations; and also from those cases where absolute reliance was placed upon open gates and the traveler exercised no care whatever, as in *Blanchard* v. *Maine Central R. R. Co.*, 116 Maine, 179. Nor does the testimony here bring the plaintiff's case within the oft recurring dilemma that either the traveler did not in fact look or listen, or if he did he must have seen the train and tried to cross in advance, in other words those cases where the plaintiff's story is inherently improbable, as in *Blumenthal* v. *B. & M. R. R.*, 97 Maine, 255, and *McCarthy* v. *B. & A. R. R.*, 112 Maine, 1.

The plaintiff's testimony here is neither inherently improbable nor incredible. The automobile was proceeding at less than the ten mile speed permitted within one hundred feet of the crossing. Public Laws 1917, Chap. 50, Sec. 3. He prudently looked for an approaching train as soon as there was an opportunity to look. He could see southerly about one hundred feet all clear. Further vision was barred by the trees and bushes for which the defendant alone was responsible. Had these been removed as they since have been, he could have seen a distance of about three hundred and fifty feet, and this unfortunate accident would doubtless have been avoided. He then with equal caution looked in the opposite direction because a train might be coming from the north. Nothing was seen. When he turned back the engine was right upon them, too late for escape, having traversed the one hundred feet in less than five seconds if the speed was correctly given as fifteen miles per hour.

It further appears that the loud noise that usually accompanies the passage of a train was wanting, and this is readily accounted for. It was a light train, made up of a locomotive and four cars. It was not moving at a high rate of speed. The engineer says he was running "with a light throttle and half stroke." The grade was slightly descending and some of the witnesses describe the movement as similar to coasting. "It was sliding right along just as there wasn't any noise, or no puffing sound" as Mr. Jones described it; "Glided along and caught us" as Mrs. Jones put it. In fact it came so quietly that several of the worshippers in a nearby church with its windows open testified that the train moved with much less noise than usual and did not interfere with the preaching as it had usually done.

It is therefore the opinion of the court that the jury were justified in finding that the plaintiff was watchful and attentive, that he looked and listened with senses alert, that he endeavored to seasonably ascertain the approach of the train and took all the precautions that a reasonably prudent man under like circumstances is held bound to take. Therefore he is not precluded from retaining his verdict.

No question as to excessive damages is raised.

*Motion and exception overruled.*