## COX *v.* LOS ANGELES & SALT LAKE RAILROAD COMPANY ET AL.

No. 3126

April 4, 1936.                                    56 P. (2d) 149.

*Leo A. McNamee, Frank McNamee, Jr., Brown & Belford,* and *Malcolm Davis,* for Appellants:

*Chas. Lee Horsey,* for Respondent:

## OPINION

By the Court, TABER, J.:

Plaintiff was injured when a loaded truck driven by him was struck by one of defendant company's freight trains on a crossing at Moapa, Clark County, on the 22d day of February, 1933. Claiming that his injuries were the result of defendants' negligence, plaintiff brought this action in the Eighth judicial district court, praying judgment, (a) for $25,200 as actual damages for loss of earning power due to permanent partial disability, (b) for $15,000 as actual damages for physical pain and distress and mental anguish, and (c) for $10,000 as punitive damages. Defendants denied that they were guilty of any negligence, and defended further upon the alleged ground that plaintiff's own negligence was the proximate cause of his injuries, or that if there were any negligence on the part of defendants, any recovery by plaintiff was barred by reason of his contributory negligence. After a trial by the court, sitting without a jury, judgment was rendered in favor of plaintiff, awarding him $5,880 as actual damages for loss of earning power. Defendants have appealed from said judgment, and from an order denying a new trial.

Moapa is a town on the main line of defendant company's railroad between Las Vegas, Clark County, Nevada, and Caliente, Lincoln County, Nevada. It is

not a large town, consisting, to judge from the photographs in evidence, of some twenty-five or thirty buildings. The direction of the railroad is such that for convenience we will say it runs north and south through Moapa. The passenger depot is on the west side of the tracks, and state highway No. 7A grade crossing, where the accident happened, is slightly more than 50 feet from the north end of the depot platform. Said highway crosses the railroad tracks at right angles, east and west. To the east of the depot are four railroad tracks. Commencing at the east, we shall designate these tracks, in accordance with the numbers used at the trial and in the briefs and arguments in this court, as 1, 2, 3, and 4. Tracks 1 and 2 are house tracks, track 3 a passing track, and track 4 the main line. The accident occurred on track 4, nearest the depot. Each one of these tracks is 4 feet 8½ inches wide. From the west rail of track 1 to the east rail of track 2 is 6 feet. From the west rail of track 2 to the east rail of track 3 is 10½ feet. From the west rail of track 3 to the east rail of track 4 is 12 feet 3 inches. The overhang of a railroad freight car is 2½ feet, and that of a locomotive, 3 feet. The truck driven by plaintiff was about 20 feet long, and its front end was 6 feet from the place where plaintiff sat while driving. Going towards Las Vegas, and about a half mile south of the depot at Moapa, the railroad curves to the westward around some low hills. The engine and cars of a train coming into Moapa from the south cannot be seen from there until they emerge from behind said hills in rounding the curve. Going northwards out of Moapa the railroad makes a similar curve, to the left, around low-lying hills, and the engine and cars of a train coming from the north cannot be seen from Moapa until they emerge from behind these hills in rounding said curve. Track 3, though not a main line track, extends as far as the eye can see from the depot around both of said curves. Track 1 is the shortest of the four tracks, track 2 being next shortest. The two points where track 1 joins track 2 and the two points where track 2 joins track 3 are within the range

of vision both ways from the depot, but tracks 1 and 2 both extend a considerable distance further to the south than to the north from the place where the highway crosses all of said tracks.

About 10 feet north of said crossing, on the east side of all said tracks, is a warehouse, the nearest corner of which is about 6 feet from the east rail of track 1. At the time of the accident, and for at least two and one-half days immediately prior thereto, there were two lines of freight cars standing on tracks 1 and 2—about eight or nine of such cars on each of said tracks. Most of them were box cars. The car nearest the highway on track 1 was about 10 feet from the road, and the car nearest the highway on track 2 about 15 feet from the road. There were no cars on track 3 and none on track 4, except those on the train which struck plaintiff's truck. To a person approaching the crossing from the east or northeast, the view to the south was obstructed to a large extent by various buildings and trees. The effect of defendants' allowing the cars to stand on tracks 1 and 2 was to further obstruct the view to the south to such an extent that one crossing the tracks from east to west could not have a view along the tracks to the south until arriving at a point 2½ feet west of the west rail of track 2. Notwithstanding this added hazard, defendants did nothing whatever in the way of taking extra precautions to safeguard persons using said crossing. Among the many safeguards that might have been adopted by defendants was to decrease the speed of northbound trains, particularly those passing through Moapa without stopping. There was no automatic electric wig-wag or bell at said crossing, nor any gates or watchman.

We quote the following from the trial court's findings of fact:

"On the 22d day of February, 1933, the plaintiff, Elson H. Cox, was driving a Mack auto truck, construction No. 11, and, pursuant to his employment by Nevada Contracting Company, was engaged in hauling a load of gravel from the certain gravel pits situated

about three-quarters of a mile northeasterly from the Town of Moapa, Clark County, State of Nevada, to a place on the new State Highway No. 7A, then under construction, such place to which the plaintiff was hauling being about two and one-quarter miles from said gravel pits.

"Plaintiff, traveling from said gravel pits, traveled upon a temporary gravel haul road until he reached the point where same joined or led into temporary State Highway No. 7A, about 550 feet from the place of intersection of said temporary State Highway No. 7A with the tracks of the Los Angeles & Salt Lake Railroad Company in the railroad yards at the said Town of Moapa, Clark County, Nevada.

"Plaintiff, thereupon, passed from said gravel haul road onto said temporary State Highway No. 7A. Said gravel haul road, upon which plaintiff was traveling, passed over a hill near such place of joinder with said temporary State Highway No. 7A. When the plaintiff traveled over said hill, he was traveling about 10 or 12 miles per hour, but as he started down said hill he applied the brakes to his truck and gradually reduced the speed thereof until, when he reached the point where said temporary State Highway No. 7A merges with, or joins, the old Moapa-Glendale-St. Thomas High Road, about 75 feet from the railroad tracks, he was traveling about 3 miles per hour. The plaintiff continued traveling about 3 miles per hour until he was about 20 feet east of the most easterly of the railroad tracks of the defendant corporation, at which point he shifted gears.

"The old Moapa-Glendale-St. Thomas High Road is an old road which has been used generally by the traveling public for many years, and from such place of joinder with said temporary State Highway No. 7A, such two roads continued on together to their place of intersection with the railroad tracks. The view of the railroad tracks to the south of Moapa, to one traveling as plaintiff was traveling, from the top of said hill, in a

general westerly, or slightly southwesterly direction, toward said railroad tracks, was very much obscured by buildings and trees along, near and east of the railroad right-of-way, and by the topography of the country. From the top of said hill, it was plaintiff's experience, according to the evidence, that he could see a train, when same rounded the curve of the railroad, about one-half mile from Moapa, and emerged from behind the hills there situated, but as he descended from said hill, and traveled toward the railroad tracks, it became increasingly difficult to see the railroad, as his line of vision became lower than the height of the obstructions.

"On the trip mentioned, on February 22, 1933, the plaintiff, when at the top of the hill, looked and listened for a train, and continued to do so from time to time until he reached the railroad tracks. * * *

"Upon approaching the first, or most easterly track, the plaintiff looked toward the south and listened for a train, but did not see or hear any. Plaintiff's view toward the south was then very much obstructed by the intervening structures and trees, and by the freight cars upon said tracks, Nos. 1 and 2, that had been left so near the highway.

"That thus leaving said cars so parked upon said tracks Nos. 1 and 2 was unnecessary and not required by the exigencies of the railroad operations of the defendant corporation, there then being ample track space within the yard limits of said defendant corporation for the leaving of said cars elsewhere; furthermore, said cars were thus left upon said tracks for an unnecessary and unreasonable length of time not required by the exigencies of the business of the said defendant corporation.

"Plaintiff, being required by his employment to proceed with his load of gravel, and his view to the south being obstructed by said freight cars, relied, according to the evidence, upon his sense of hearing, and upon the Railroad Company performing its duty by giving him

proper warning of an approaching train from that direction. He looked again to the south, and listened carefully, as he crossed track No. 1, and, not being able to see more than 25 feet in that direction, because of said freight cars, and not seeing or hearing any approaching train, proceeded to cross the second track. When he reached said second track, his view to the north became more free from obstruction than it had been for some time, his view in that direction, until after passing the first track, having been obstructed by the angle of the Sloan Warehouse and due to the curve of the railroad toward the north, and after again looking south, he looked toward the north, along the railroad tracks, for any train that might be approaching from that direction. Plaintiff commenced looking north when he was crossing track No. 2, and continued to look in that direction until he was crossing track No. 4.

"According to the evidence, plaintiff, when he was about 20 feet east of the tracks, and had shifted gears, had brought his truck almost to a stop. After shifting gears, and when crossing the tracks, the plaintiff, according to the evidence, was traveling not more than 5 miles an hour. *  *  *

"From the point on track No. 2 from which plaintiff started to look to the north, along the tracks, when he was crossing track No. 2, to the place where he was when the collision occurred, which he testified was when his seat was just over the west rail of track No. 4, would be a distance of about 34 feet, and as he was traveling about 5 miles per hour, he would have consumed, in thus looking toward the north, about 4.63 seconds.

"The Court believes, from the evidence, and hereby finds, that thus looking to the north for said 4.63 seconds was not, under the circumstances then and there existing, an unreasonably long time for him to be looking in that direction, and that the plaintiff, in approaching said railroad tracks, in crossing same, and in looking and listening for approaching trains, to the extent and in the manner that he did, exercised the degree of care

that an ordinarily careful, prudent person would have exercised under like circumstances. * * *

"From the evidence, the Court finds, that only the usual blasts of the whistle of said train were blown, upon said 22d day of February, 1933, in approaching said highway crossing; that is, after rounding the curve, about one-half mile west of the Moapa station, there were four short blasts, then an interval of time, and then the crossing signal of two long blasts and two shorts was given. The time which elapsed from the blowing of the first blast of the whistle about a mile west of the depot and crossing, until the said train arrived at said last mentioned place, was approximately two and one-half minutes, or 150 seconds. During such period of about 150 seconds there were intervals of time aggregating about 75 seconds, or 50% of the total time thus consumed, during which no blasts of the whistle were blown.

"The Court further finds that, upon said train approaching said crossing, on the 22d day of February, 1933, the bell of the locomotive was rung no more than same was usually rung at said place upon other trips when the view of travelers was unobstructed by freight cars left upon said side tracks near said highway crossing. * * *

"The Court further finds, from the evidence, that, when the train passed the "S" board, approximately one-half mile west of the west switch, same was traveling about 32 or 33 miles an hour, and that when the train crossed in front of the depot, and reached the highway crossing, where the collision occurred, it was traveling at least 20 miles an hour. The Court finds further, from the evidence, that the engineer of engine No. 8809, which struck plaintiff, could not, when approaching said highway crossing, because of being on a curve (the front of the engine obstructing his view), see the highway crossing until within about 340 to 350 feet of same, and that it would have required only 10 or 11 seconds, traveling at 20 miles an hour,

to travel that distance, but that, traveling at that rate, it would have required about 40 seconds to bring the train to a stop. The Court finds further, from the evidence, that the engineer of said train, in order to have been able to stop in the 340 to 350 feet, after said highway became visible, would have had to reduce the speed of the engine to not exceeding 8 miles an hour. * * * "

██ We agree with the trial court that defendants were negligent in allowing the cars on tracks 1 and 2 to remain there for an unreasonable length of time without taking any extra precautions to safeguard persons who might use the crossing; but we are clearly convinced that plaintiff was also negligent in not stopping his truck or motor at any time, and in proceeding from a point 2½ feet west of. the west rail of track 2 onto track 4 without once looking to the south.

The trial court found that the customary whistle signals were given, also that the bell on the locomotive was ringing while the train was approaching the station. The testimony clearly shows there can be no reasonable doubt that plaintiff would have heard some of the whistling, if not also the bell and the rumble of the train, had he stopped his truck and its motor and listened, either before going onto the tracks, or while crossing them. He certainly would have heard what a number of other witnesses *did* hear. One of plaintiff's witnesses testified at the trial that he heard four short blasts; on cross-examination he admitted that in a statement made shortly after the accident he said: "I recall very distinctly that there were two long and two short blasts of the whistle, and that this whistle ended when the train was right back of the depot building." That plaintiff would have heard some of the warning signals, had he stopped and listened, is borne out by his own testimony to the effect that if there had been any whistling he would have heard it *without stopping*. Anna C. Killeen, postmistress at Moapa, heard the engine whistle just prior to the accident, although she was in the room back of the post office,

which is located on the street west of the tracks, in the block north of the crossing. Plaintiff gave the following testimony concerning his truck and the noise made by it: "Coming down the hill my truck was making the ordinary noise of a truck, and the truck was in fairly good shape.

"Q. There was a kind of a rumble in your seat? A. Any truck there is a certain amount of noise, yes.

"Q. Quite a bit of noise? A. Not out of the ordinary for a truck of that type.

"Q. You testified when you gave your deposition it made quite a bit of noise. A. Quite a bit of noise, yes.

"Q. Well, that's correct, isn't it, it made noise? A. For a truck, yes.

"Q. Considerably more noise going than when it is standing still? A. Oh, yes. The truck had a muffler on it. It was a Mack truck. It had a six yard body on it, and I think it was rated either 2½ or 3 ton truck. It carried 6 cubic yards of gravel. We were hauling 5 yards on them at that time."

Mr. Loughley, one of plaintiff's witnesses, testified, like plaintiff, that he did not hear *any* whistle, but that he would more than likely have heard a blast from where he was if there had been one. As a matter of fact there were nine blasts—a long one about a mile from the station, four short ones as the train rounded the curve, and two long and two short ones as a crossing signal — the last one ending just as the engine reached the depot.

Besides being negligent in not stopping his truck or its motor at all so that he could listen effectively, the evidence also clearly shows that plaintiff did not act as a reasonably prudent man when he traversed the space from track 2 to track 4 without so much as glancing to the south after passing a point 2½ feet west of the west rail of track 2. From the time when plaintiff arrived at track 1, his view to the north was clear and unobstructed. Looking to the south before arriving at a point 2½ feet west of the west rail of track 2 was useless. According to plaintiff's own testimony, he did not

look south at any time after passing track 2 until he was part way across track 4. Emerging from the west overhang of track 2, plaintiff traveled 16 feet before reaching a place where the front end of his truck would enter the east overhang of track 4.

Plaintiff did not at any time stop his truck and its motor so he could listen effectively, nor did he, after coming down off the hill, look to the south before crossing track 4 at any time, except when his view in that direction was obstructed. Thus there was a failure to look as required by law, as well as a failure to stop and listen. If plaintiff had acted with ordinary prudence he would have had time to see the train coming from the south, and to stop before the front of his truck arrived at a point three feet east of the east rail of track 4.

It is to be borne in mind that plaintiff was familiar with this crossing and had passed it going back and forth a number of times on each of the two days imme-. diately preceding the day of the accident, as well as on the morning of that day. The cars standing on tracks 1 and 2 had not been moved since plaintiff went to work at Moapa 2½ days before.

In support of our view that plaintiff was negligent in neither listening nor looking effectively as a person of ordinary prudence, under all the circumstances should have done, we cite the following authorities: Hartl v. Chicago, M., St. P. & P. R. Co. (C. C. A.) 73 F.(2d) 875; California Rendering Co. v. Pacific Electric R. Co., 205 Cal. 73, 269 P. 922; Baltimore & O. R. Co. v. Goodman, 275 U. S. 66, 48 S. Ct. 24, 72 L. Ed. 167, 56 A. L. R. 645 (as modified by Pokora v. Wabash R. Co., 292 U. S. 98, 54 S. Ct. 580, 78 L. Ed. 1149, 91 A. L. R. 1049); Lockett v. Grand Trunk Western R. Co., 272 Mich. 219, 261 N. W. 306; Stephenson v. Northwestern Pac. R. Co., 208 Cal. 749, 284 P. 913; Johnson v. Missouri Pac. R. Co. (Mo. App.) 72 S. W.(2d) 889; Eddlemon v. Southern Pac. Co., 41 Cal. App. 340, 182 P. 811; Golay v. Northern Pac. R. Co., 105 Wash. 132, 177 P. 804, 181 P. 700; Jones v. Southern Pac. Co., 34 Cal. App. 629, 168 P. 586;

Cathcart v. Oregon-Washington R. & N. Co., 86 Ore. 250, 168 P. 308; Wehe v. Atchison, T. & S. F. R. Co., 97 Kans. 794, 156 P. 742, L. R. A. 1916E, 455; Farden v. Great Northern R. Co., 189 Minn. 17, 248 N. W. 284.

We are not to be understood as holding that drivers of motor vehicles must always stop before going upon railroad crossings; nor do we hold that in the instant case it was plaintiff's duty to first stop the truck, and then get out and walk forward to a point where he could have a clear view in both directions.

■ With respect to the question as to defendants' negligence, we deem it pertinent to further observe that although defendant engineer had clear view of the crossing for at least 340 or 350 feet, he did not, according to his own statement, know there had been an accident until informed by the fireman that the train had struck a truck. It is the duty of enginemen to keep a vigilant lookout while approaching town railroad crossings. Deiss v. Southern Pac. Co., 56 Nev. 151, 47 P.(2d) 928. The evidence shows that if the engineer had been vigilantly looking along the track he would certainly have seen the truck for some distance before reaching the crossing, and might have been able, by applying the emergency brakes, to retard the speed of the train sufficiently to lessen the seriousness of the accident, if not prevent it.

■ Returning now to the matter of plaintiff's negligence: A recovery will not be barred if such negligence was not a proximate cause of the injury. If his negligence was remote, and without it he still would have suffered the injuries, then it was not contributory in the sense of the law. O'Connor v. North Truckee D. Co., 17 Nev. 245, 30 P. 882. In Musser v. Los Angeles & S. L. R. Co., 53 Nev. 304, 299 P. 1020, 1024, this court defined "contributory negligence" as "such an act, or omission of precaution, on the part of the plaintiff, amounting in the circumstances to such want of ordinary care as, taken in connection with the negligent act, or omission of precaution, on the part of the defendant proximately contributes to the injury complained of."

It is not necessary that the plaintiff's negligence shall have been the sole proximate cause of the injury. 1 Thompson on Negligence, sec. 217; Pinson v. Young, 100 Kans. 452, 164 P. 1102, L. R. A. 1917F, 621. In the instant case, plaintiff's contributory negligence was clearly a proximate cause of the injuries.

If in this case the injuries had been willfully, wantonly, or recklessly inflicted, plaintiff's contributory negligence would be no defense. Crosman v. Southern Pac. Co., 44 Nev. 286, 194 P. 839; Restatement of the Law of Torts, vol. 2, secs. 481, 482. But, while defendants were guilty of negligence, we are satisfied that they did not intend that plaintiff or anyone else should be injured as a result of their negligence, nor do we believe that plaintiff's injuries were the result of defendants' wanton or reckless disregard of his safety.

The judgment, and the order denying a new trial, are reversed.

DUCKER, C. J.: I concur.

COLEMAN, J.: I concur in the order.

(Petition for rehearing pending.)