Clifford GOULD

v.

**BANGOR AND AROOSTOOK RAILROAD COMPANY.**

**TROMBLY CONSTRUCTION COMPANY**

v.

**BANGOR AND AROOSTOOK RAILROAD COMPANY.**

Supreme Judicial Court of Maine.

June 6, 1972.

Richard N. Solman, Caribou, Stevens, Engels & Bishop, by Richard C. Engels, Albert M. Stevens, Presque Isle, for plaintiffs.

William M. Houston, Bangor, Lynwood E. Hand, Houlton, Pierce, Atwood, Scribner, Allen & McKusick by Vincent L. McKusick, Peter L. Murray, Portland, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, and WERNICK, JJ.

WEBBER, Justice.

These two cases, tried together, resulted in jury verdicts for the two plaintiffs. The cases arise from a crossing accident in which a cement truck owned by Trombly Construction Company and operated by Trombly's employee Gould was in collision with a train operated by defendant Railroad. Applying the doctrine of comparative negligence, the jury reduced a verdict of $20,000 for Gould for his personal injuries by $8,000 but reduced a verdict of $8,000 for Trombly for its property damage by only $3,000. Since the negligence attributable to both plaintiffs is necessarily identical, it is apparent that these are inconsistent verdicts. Although in appropriate circumstances we might be disposed to correct the error by remittitur, we are satisfied in the instant case that these verdicts reflect confusion in the minds of the jury, the sources of which are apparent in the trial record. We conclude that the cases should be tried anew.

In the daylight hours of August 2, 1968 Mr. Gould was operating a fully loaded 25 ton cement mixer on Route 227 in Mapleton. The weather was clear and dry. He states that as he neared the railroad crossing he was proceeding westerly at about 20 miles per hour. The Railroad maintains at the crossing an automatic "wig-wag" signal which is so designed that when a train is approaching the signal is activated, a moving arm is set in motion and a bell rings. Mr. Gould states that he observed the "wig-wag" signal and the arm was not in motion. Mr. Gould did not hear the bell ring nor did he hear the train whistle although other disinterested witnesses heard both. There were two motors operating on the cement mixer, one propelling it forward and the other operating the mixing equipment. The evidence is silent as to whether the "wig-wag" and the bell on the automatic signal could fail independently of each other. There was a potato house near the track and 120 feet from the crossing. Until a train clears the potato house it is obscured from the view of a traveler approaching the crossing as was this plaintiff. It was stipulated that the speed of the train as it appeared from behind the potato house was 38 miles per hour or approximately twice the speed of the truck as

estimated by Mr. Gould. Mr. Gould saw the train when it emerged from behind the potato house. It is apparent, therefore, that approximately two seconds elapsed during which the train traveled 120 feet while the truck traveled approximately 60 feet. Mr. Gould did not apply his brakes but attempted to cross ahead of the train. The rear of his truck was struck by the engine. The last car in the train came to a stop 693 feet beyond the crossing.

■■■ On these facts the functioning of the automatic signal became an important factor. If the "wig-wag" was operating, and the evidence is conflicting on this point, the negligence of the plaintiffs would as a matter of law have been at least equal to or greater than that of the defendant, and plaintiffs would be barred from recovery. A number of applicable rules of law combine to produce this result. A train has the right of way at a grade crossing and it is the duty of the traveler to wait for the train. Hesseltine v. Maine Central Railroad Company (1931) 130 Me. 196, 199, 154 A. 264. A collision at a railroad crossing is prima facie evidence of negligence on the part of the traveler. Hesseltine v. Railroad Company, supra. The motorist must look and listen, not simply with physical eyes and ears, but with alert and intent mind, that he may actually see and hear if a train be approaching. If the motorist's view of the track be obstructed for any reason, even greater care is required in looking and listening. The care of the traveler must be commensurate with the peril. Hesseltine v. Railroad Company, supra; Ham v. Maine Central Railroad Company (1922) 121 Me. 171, 174, 116 A. 261; Plante v. Canadian National Rys. (1942) 138 Me. 215, 219, 23 A. 2d 814; Witherly v. Bangor & Aroostook Ry. Co. (1932) 131 Me. 4, 8, 158 A. 362; Johnson v. Maine Central Railroad Co. (1944) 141 Me. 38, 43, 38 A.2d 884; Flood v. Belfast & Moosehead Lake R. R. Co. (1961) 157 Me. 317, 322, 171 A.2d 433. 29 M.R.S.A., Sec. 998 provides in part:

"Whenever such crossing is protected * * * by automatic signal, every such motor vehicle operator * * * if * * * the operation of the automatic signal shall indicate that a train is approaching, shall bring such vehicle to a full stop at a distance of not less than 10 feet from the nearest rail of the crossing and shall not proceed on or across the railroad track or tracks * * * if the crossing is protected by automatic signal, until such driver has ascertained that no train is approaching. This provision shall be deemed to require a precaution in addition to the duties and precautions imposed by law on persons approaching or crossing a railroad grade crossing."

Applying these basic rules to the facts in the instant case and assuming alternatively that the automatic signal was functioning, it is apparent that if Mr. Gould had brought his vehicle to a stop 10 feet from the crossing, the train would have been plainly visible 20 to 30 feet away and would have proceeded safely in front of the stopped vehicle. As already noted, failure to heed the signal, if functioning, and to look, listen, see and hear under these circumstances would effectively preclude recovery for these plaintiffs. No instruction was given to the jury that if they found that the automatic signal was functioning properly, they must find for the defendant.

The jury may have concluded that the automatic signal was not functioning, a situation which gives rise to the application of other principles of law which were never adequately explained to the jury.

■■■ Although the instructions to the jury contained the gist of the statutory requirements with respect to the maintenance by the Railroad of a bell and whistle on the locomotive and the sounding thereof as contained in 35 M.R.S.A., Sec. 821, the nature of the conflicting evidence on these issues was such as to require a clarifying

instruction on the weight to be assigned to positive and negative testimony. With particular respect to the locomotive whistle Mr. Gould could only state that he did not hear it whereas disinterested witnesses heard it plainly. It was stated in Ham v. Railroad Co., supra at page 176 of 121 Me., at page 264 of 116 A. that "positive testimony has far greater probative force than negative." A statement in negative terms may nevertheless constitute positive testimony under appropriate circumstances. We attempted to clarify the distinction further in Perry v. Butler (1946) 142 Me. 154, 159, 48 A.2d 631, 634, when we said, quoting 32 C.J.S. Evidence 1079:

" 'The witness's testimony of failure to see or hear is negative if he was paying no particular attention; testimony that the witness did not see or hear something which he would have observed had it occurred is more commonly regarded as positive.' "

Testimony that a witness did not hear a particular sound may have only the slight probative value of negative evidence if the opportunity to hear the particular sound was greatly diminished or destroyed by impeding factors. One such factor of common occurrence is a loud competing sound. Thus in the instant case it was important that the jury, in determining whether or not to assign the weight of positive evidence to testimony negatively stated, should ask itself whether or not the witness was listening with mind alert and attentive to the warning sounds of an approaching train, and whether or not sounds otherwise audible were rendered inaudible to the witness as, for example, by the sound of two truck motors in close proximity to the witness.

■ A closely related issue arose from evidence that the largest of three whistles on the locomotive was cracked, that this crack affected the tone and volume of sound and that the defective condition was not discovered by the engineer until after the accident. The Justice below dealt with this matter by merely saying, "And there has been testimony that the whistle was defective. That is for you to decide. Could it be heard?" This brief comment was an oversimplification of a complex problem. The statute, 35 M.R.S.A., Sec. 821, provides only that each locomotive be equipped with "a whistle" to "be sounded as a warning beginning at a distance of 60 rods * * * from all crossings of such ways on the same level." It is apparent that the statute does not require the continuous sounding of the whistle until the crossing is passed as is required with respect to the ringing of the bell. In this case the undisputed evidence shows that the locomotive was equipped with three whistles so arranged as to sound simultaneously. Thus, if these three whistles were first sounded at least 60 rods from the crossing, there was no *statutory* violation even if one was cracked. Nevertheless, the defendant had an obligation to exercise due care to maintain its warning devices in good working condition, apart from the specific statutory requirement, and it was for the jury to say whether or not defendant had failed in this respect, and if so, whether or not the defect in one of three whistles had so affected their combined tone and volume as to render them incapable of giving reasonable warning of the approach of a train. Only after such finding could the jury properly address itself to the question as to whether or not such failure was a contributing factor in this accident.

■ One issue was improperly submitted to the jury. This related to the presence of trees and bushes and their possible obstruction of view. Whether or not their presence might or might not have somewhat limited the view of and from a *small* vehicle approaching the crossing has no bearing whatever on the facts of this case. The undisputed evidence shows that the *only* obstruction to view which affected the

conduct of these parties was the potato house located 120 feet from the crossing. Mr. Gould candidly admitted that he saw the locomotive when it emerged from behind the potato house. Mr. Perrigo, the engineer, with equal candor stated that the trees and shrubs offered no obstruction to his view of a *large* vehicle approaching the crossing and gave the very practical reason that, sitting high in the cab of the locomotive, "we're above those trees." The jury might well have gained the erroneous impression from the instructions given them that they were free to predicate negligence of the defendant on its failure to remove such trees and bushes from land not even shown to be owned or controlled by the Railroad.

The jury should have been instructed to disregard the evidence as to the presence of trees and bushes because admittedly not a factor in the case, but to consider only the obstruction to view caused by the potato house owned and controlled by the witness Chandler and situated on land leased by him from the Railroad. Plaintiffs do not and could not assert any claim of negligence on the part of the Railroad based upon its merely permitting Chandler to maintain the potato house where it was located. The jury should have been instructed, however, with respect to the potato house that where for any reason obstructions to view exist, the thrust of the law is to require greater vigilance on the part of both traveler and Railroad. Ham v. Railroad Co., supra.

■■■■ The rules of law respecting the non-functioning of the automatic signal were not amplified or clearly stated for the benefit of the jury. The jury must have understood from the instructions that if the "wig-wag" was not functioning at the time of the accident, this was negligence per se on the part of the Railroad. We conceive the true rule to be that it is not the duty of the Railroad to insure the operation of the signal under all circumstances, but rather to exercise reasonable care to maintain the automatic signal in working condition. Reasonable care would include the making of periodic inspections at reasonable intervals and the prompt repair and correction of any defects in the signal which the Railroad knew or ought reasonably to have known existed therein. The authorities are in conflict as to the effect to be given to proof of failure of an automatic signal on a single occasion.[1] It must be recognized that such malfunction can be attributable to the sudden unexplained failure of a mechanical part without fault of the Railroad or reasonable opportunity to make repair. Cf. Glazer, Chandler v. Grob (1939) 136 Me. 123, 125, 3 A.2d 895 and Great Atlantic & Pacific Tea Co. v. Kennebec Water District (1943) 140 Me. 166, 169, 34 A.2d 729. Nevertheless, the importance of the proper functioning of an automatic signal to the safety of Railroad employees and the traveling public cannot be minimized. Moreover, the Railroad has the means of assembling facts and information not readily ascertainable by the traveler and is in far better position to produce explanatory evidence of inspection methods and of defects, if any there be, the nature of which is such that the Railroad cannot properly be charged with negligence in failing to make correction before an accident occurs. In short, there exists one of the recognized policy reasons for giving some procedural effect to proof of failure of an automatic crossing signal to function on a single occasion. We accordingly hold that proof of such a single occurrence by the fair preponderance of the evidence will give rise to a rebuttable presumption that such failure resulted from the negligence of the Railroad. This presumption casts upon the Railroad the burden of coming forward with evidence by way of explanation which

1. These authorities are assembled in an Annotation found in 90 A.L.R.2d 350.

satisfies the factfinder that the probabilites as to defendant's negligence are at least in equilibrium. In that event the presumption disappears and plaintiff must satisfy his burden of proof of negligence upon the whole evidence. Hinds v. John Hancock Mut. Life Ins. Co. (1959) 155 Me. 349, 155 A.2d 721.

In the instant case the defendant saw no occasion to come forward with explanatory evidence which would demonstrate a non-negligent malfunction since its position was that no failure of the automatic signal occurred. On this threshold issue of fact the plaintiff, as we have noted, had the burden of proving by the fair preponderance of the evidence that the signal did not function and it was for the jury to say whether or not it found the testimony of Mr. Gould more credible than that of those witnesses whose testimony tended to prove that the signal was at all material times in perfect working condition. Unless and until the jury was satisfied on this preliminary issue of fact, no presumption of defendant's negligence could or would arise.

The failure of an automatic signal to function on a single occasion, however, *even when not caused by any negligence of the Railroad,* does, if it be proven, become a factor for consideration by the jury in assessing the contributory negligence of the traveler. The inactivity of an automatic signal has a natural tendency to lull the traveler into a false sense of security and induce a certain relaxation of vigilance. This does not mean, however, that the traveler can blindly rely upon the automatic signal and exercise no care to ascertain the presence of an approaching train. The rule was well stated in Johnson v. Southern Ry. Co. (1961), 255 N.C. 386, 121 S.E.2d 580, 582 in these terms:

"The mere momentary failure of an automatic signaling device to operate upon the occasion of an accident is not evidence of negligence on the part of the railroad company. *Res ipsa loquitur* has no application in such circumstance. * * * But it is proper to consider such failure in measuring the care exercised by the traveler in negotiating the crossing, and it is therefore relevant on the question of contributory negligence. * * * A traveler on a highway has the right to place some reliance upon an automatic crossing signal, especially if his view is obstructed. * * * But the fact that an automatic warning signal is not working does not relieve the traveler of the duty to look and listen for approaching trains when from a safe position such looking and listening will suffice to warn him of danger."

Where gates at a crossing were left open, our Court said in Blanchard v. Maine Central Railroad Co. (1917), 116 Me. 179, 182, 100 A. 666, 667, "While the fact of open gates is a circumstance which a traveler may properly take into consideration, and upon which he may place some reliance, this does not relieve him of all care. * * * The extent to which he may rely upon the invitation given by open gates is a question of fact for the jury, unless it appears that he relied exlusively thereon." *Blanchard* was quoted and applied in Hesseltine v. Railroad Company, supra.

None of the foregoing rules of law applicable if the automatic signal failed to function was given to the jury. Even though no objection was offered to the instructions as given and no additional instructions were requested, the instructions were so inadequate and misleading as to leave the jury without the guidance essential to its task. Under these circumstances prejudicial error is manifest and a new trial is required.

 After the jury had deliberated for about six hours, the Justice below without objection gave them an additional charge which was an adaptation of the "Tuey-Allen"[2] charge commonly referred to as "8th Cushing" and in recent times often colorfully characterized as the "dynamite charge." We recently had occasion to discuss at length the potentially coercive effect of this charge in State v. White (1972–Me.) 285 A.2d 832, 836[3] and therein recommended the substitution in future trials of the A.B.A. standard therein fully set forth. The admonition in White was intended to apply to civil as well as to criminal trials. There is, however, an additional reason for abandoning any future use of a modified "Tuey-Allen" charge in present day trials of civil actions. 14 M. R.S.A., Sec. 1354 enacted by P.L.1969, Ch. 310 provides for verdicts in civil suits by the agreement of nine or more of the jury panel. The rendering of a verdict is no longer prevented by "pride of opinion" or an arbitrary and obstinate refusal to yield to reason on the part of one or two jurors which the "Tuey-Allen" charge was intended to dissipate. The statute has itself greatly reduced the danger of a "hung jury" and the resulting necessity of a new trial. A charge which in effect directs a solid minority of at least four jurors to reconsider their views with an eye to conforming them to those of a group which at most numbers no more than eight tends to become impermissibly coercive. We take this opportunity to indicate that the "Tuey-Allen" type of charge no longer has any place in the trial of civil actions.

The entry will be

Appeals sustained. New trials ordered.

ARCHIBALD, J., did not sit.

All Justices concurring.

---

**2.** Commonwealth v. Tuey, 8 Cush. (Mass.) 1; Allen v. United States (1896) 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (approving the Tuey charge).

**3.** The Justice below did not have the benefit of our admonition in *White* since the case now before us was tried in 1970.